We have six cases before us today. Two of them have been submitted on the briefs. And our first case this morning is Adaptix, Inc. v. Apple Inc., 15-1441. Mr. Russell, are you ready? I am, Your Honor. You may proceed. Good morning. May it please the Court, Kevin Russell on behalf of Plaintiff and Adaptix, Inc. Defendants Verizon and AT&T condition access to their LTE networks on their customers using smartphones and tablets that will practice the method pattern at issue in this case upon the carrier's command, that is, immediately upon receipt of an instruction from the carrier's cell tower. Mr. Russell, am I correct in my assessment that there currently exists no test for assigning responsibility for steps that are performed by device? I think that that is correct, that this Court has not directly and clearly grappled with that. We think that the parties have offered this Court two frameworks for analyzing that question. One is the one that we offer, which is to ask who controls and directs the device's performance of the method. And the defendants have suggested, no, instead you should simply assume that the end user who owns, possesses, and generally controls the device is responsible for performing the method even if they don't control its specific performance of this activity. After this Court's decision in Akamai, we went under either framework because even if you accept the defendant's position that the consumer should be seen as performing the method steps that are taking place inside the phone, we should still be entitled to show that those infringing actions ought to be re-attributed back to the carriers because the carriers have conditioned access to their network. What initiates the performance of the method steps? Here, the last thing in the string of causation, and of course all things have strings of causation that are complex at times, but the last thing that happens is the carrier sends a signal to the handset to produce a Mode 3 report. And producing a Mode 3 report is to perform the method. And that action will take place if and only if that instruction is sent. It's as if the defendants are flicking a light switch. That is, you could ask, who is in control of the light turning on? And you could say, look, the light's not going to turn on unless somebody manufactures and designs the light bulb and the light switch. But I want to be clear about this. The method, the initiation of the performance of the method, is it initiated when the phone gets a pinging from a cell tower? Or does the phone on its own at certain times initiate the performance? No, in this mode. So we're talking about the base stations can operate in modes that don't infringe. But in Mode 3... Can I ask you just to speak up just a little bit more? So the phones can operate and the network can operate in modes that don't infringe. It only infringes when the base stations are operating in Mode 3. They instruct the phone to operate in Mode 3, and the phone has to do it. And it will only happen in that circumstance if the cell tower base station sends the instruction. There's nothing the user can do to cause, to direct the phone to practice the patent. It will only ever happen if that instruction is sent. Can the user stop the performance of the method? They can't once that signal is received. It happens in milliseconds. Of course, they can turn the phone off. It's not going to perform if the phone is not on. But that's to return to the light switch analogy. That's like plugging in the lamp. It doesn't necessarily... It's not going to... The lamp's not going to turn on without it being plugged in. But plugging the lamp in isn't to use the lamp, and it's not to control the lamp. But it turns on the light, doesn't it? Well, no, it doesn't until somebody flips on the switch. That's what I mean. You've got to flip it on in order to make it work. So the steps aren't performed unless the user turns on the remote phone. No, I... So in my analogy, I think that the proper way to view it is the user is plugging in the lamp. So that the process isn't going to happen. The light's not going to turn on unless that happens. But plugging it in doesn't turn the light on. Somebody has to flick the switch. And here it is the carriers who are flicking the switch. They are sending an instruction, the principal purpose of which is to tell the phone, practice the method. Does the claim require flicking on the switch? I'm sorry? Does the claim require flicking on the switch? Using your analogy, if the switch is already turned on, when the user plugs in the lamp, the lamp turns on. Well, that's... Again, I think you would, in that analogy, still say that the person who had turned on the lamp before it got plugged in is the person who is controlling the lamp and responsible for it being turned on. But here, to be clear, all the things that the customer does simply connect them to the network. And it doesn't preordain that there's going to be infringement. Because the defendants themselves have emphasized that the network can work in other modes that don't infringe the patent. Now, if we disagree with you and think that there's no direct infringement, and instead it's induced infringement, then why can't you... Have you presented an argument on induced infringement under 271B or one of these alternatives? We included that in our claim. We have not preserved it. It went by the wayside, and we're not trying to resurrect it here on appeal. But the reasons that this court has told plaintiffs... Let me be clear. So you're not arguing any type of vicarious performance or vicarious liability? Well, we are. We are saying that we're... So let's distinguish two things. One is Akamai vicarious liability, and we are arguing that. I took your question to be about... Let me ask you, when you say Akamai vicarious liability, you're not arguing contributory infringement as an Akamai, where there's one actor that performs one step and one actor that performs the other steps. That's not your situation. But you're kind of taking Akamai and saying that it also applies in a situation where you're controlling the performance of the method by pinging, if you will, and also by having particular software in the phone that will automatically perform the method. So we're not saying that this is a divided infringement case. We are disputing the contention that Akamai applies only to divided infringement cases. And you can look at the way that this court described the rule, and Akamai said at page 1022, direct infringement under 271A occurs when all the steps of the claim to method are performed or attributable to an entity. The Supreme Court expressed the same understanding in limelight when Akamai was before the court at page 2117, that under that rule, the person is attributed either because the defendant actually performed the steps or because he directed or controlled others who performed them. And there's no reason to have a different rule for a defendant who controls all but one of the steps through his control over another person than it is not to apply that same rule when they control all of the steps. But there's no control over another person here, isn't there? I mean, we're talking about control of the remote device. That's right. We're talking about a device, not another person. That's right. And to be very clear, we're making two arguments in the alternative. The Akamai argument is raised only if you reject our principle argument that they're controlling the device and therefore they should be charged with direct infringement. If instead you adopt the defendant's position that we should treat the end user as performing the method because they own the phone, then we say that if you're going to go down that road, we ought to be able to show that the defendants control their customers under the Akamai principle because they condition receipt of a benefit that is access to their LTE network on the consumers performing the method at the time and in the manner that the carriers direct. But was there any, and I'll recall this from the record, man, was there any discussion or argument below as to whether when somebody purchases a phone and, you know, you sign that big long agreement or sometimes you don't read it, I mean, like small print, 19 pages, you're eager to use your phone, does a carrier, especially a carrier who sells the phones as well, is there any clause in that agreement that says the user agrees to allow the carrier to conduct tests, anything like that? Well, the user agreements are not in the record and I don't know of any discussion. I know the answer to the question, but here I don't think, you know, Akamai has departed from the idea that you can only control through a contract and here, as a practical matter, they are able to control their users because you cannot use the phone on the LTE network if it doesn't respond to this command by performing the method. It just doesn't work and as a matter of fact, consistent with that, I think it's fair to say that they condition access to their network on the users using a phone that they can control. And I think that under the rationale of Akamai and under the underlying principles of court law that it arose from, it's fair to say that the defendants, through that level of control over the infringement, ought to be viewed as using the patent here. Because after all, the direction and control test is simply an attribution rule. It is a rule that this court has used to say, look, when you cross the line between simply encouraging infringement, which is classic inducement, to controlling. Sir, in Centillion, we recognize liability for remotely using a claim system. This is a method. That's right. Should this court extend Centillion out to cover method claims? I'm not asking you to extend the actual rule of Centillion. I'm saying that you ought to apply the same rationale to this context because there is no reason why you should have an attribution rule about control of a system that is different than an attribution rule that's about control of a device's performance of a method. In both cases, it's fair to say that somebody can use a method remotely through their control over a machine that they do not possess, that they do not own. But nonetheless, if you were to ask who is it who is actually using the method, who is it who is controlling the device's performance of the method, it is the person who is instructing the machine to engage in the patented activity. And that's, I think, reasonable as a matter of language. If you ask who is using the patent, it's the person who is causing the device to perform it. It's reasonable in light of the background principles of attribution liability. I understand your position. And I can see how SIRF in some way has some language that helps you. Where I'm struggling is how to deal with Erickson, for example, or RICO. And I don't think those cases support your position at all. So could you explain to me what your response is? I think those cases support our position indirectly because what didn't happen in that case, those cases won't happen here. In Erickson, for example, this court made the point that D-Link, who manufactured the Wi-Fi routers, did not control the routers after they had been sold. There's nothing that they're doing that are instructing the Wi-Fi routers to practice the method. It's the users who are doing that by using the device. What's different about this case, and what's different about this case from many others, is that the defendants here are not simply providing the device that's programmed to infringe. They are taking the additional step of sending the actual instruction to the device to practice the method. And so I think Erickson would have been a very different case if D-Link retained the authority to tell the Wi-Fi routers when to practice the method and when not to. You're into your rebuttal time. Do you want to continue?  We'll restore you back to four minutes. Mr. Lee, can you cite us to any law that you consider to be controlling in this case? Yes, Your Honor, and that was going to be the first point I'd like to make. While I don't know that it answers precisely the question you put to Mr. Russell, RICO, Symantec, and Erickson all involved patented methods on devices. And the person who was identified as the direct infringer was the user in all of those occasions. And for two reasons. In Erickson, isn't there missing the control element? Your opponent says that in Erickson, Erickson did not retain the ability to control the performance or any performance on the devices once they were sold. Your Honor, two answers to the question. If we focus on direct infringement, the direct infringer in Erickson was the user. The question of whether there was vicarious indirect infringement liability on the part of someone else goes to the issue you've raised. It was not a control issue. The user was the direct infringer. And as I said, there's both a legal and a factual reason. In all three cases, the factual reason is it was the user who was using the computer. The legal reason is 271A, B, and C all refer to whoever uses. It's a person, and so they've identified the person. And actually, Adaptic's position below was consistent with those three cases and what we think is pretty well-settled law. And it goes to Judge Stoll's question about indirect infringement. There was an indirect infringement claim below. It's at A6004. It was the claim that you would expect to see. The users, the handset users, who we claim today would be the direct infringers if anyone was, were identified in the complaint as the direct infringers. And the claim against the carriers and the handset sellers at the time was indirect infringement or inducement under 271B or C. That claim was abandoned below, and it's been abandoned on appeal. And that's why we're left with these two direct infringement theories. Let me ask you a question. So your position, as I understand it, is that we should assign responsibility on the basis of who owns, possesses, or operates the devices. To phrase it even more precisely, Your Honor, I would say who operates or uses the device is consistent with 271A, which is where we're focusing today. And that actually would allow me to answer the question you posed to Mr. Russell about how this happens. Let's say you own the phone. You possess it. You own it. But you're not initiating the performance of the method. Your opponent is saying, and this is where I think, this is where the rubber meets the road. Right. Okay. So your opponent is saying the performance of the method is what we should be looking at, and that's controlled by the carriers. And that is incorrect as a factual matter, and it's something— It's incorrect that it's— They're not controlling. Well, do you disagree that the performance of the method is initiated upon receipt of a ping from the base and so forth? Your Honor, not to quarrel about words, but initiate is where I would quarrel, and the answer is yes. So here's a series of steps, which I don't think there's any dispute, but if the series of steps doesn't answer your question, I'll come back and try to come up with a different answer. So the user turns on the device. That's within the control of the user. The user actually then has to decide to use cellular communications rather than Wi-Fi, for instance. The user actually has to go one step further and actually enable the handset to use LTE. There actually is a portion of the handsets that allow you to disable LTE because it is a power-hungry communication mechanism, and it also is expensive. And in fact, their expert said, I disable LTE on many occasions. Then, even if you've done all that, you have to get yourself into an LTE. Then you have to make a data demand that is one that would require a Mode 1 or a Mode 2. Does the record reflect when the average user purchases the device from the store? Is it set in LTE mode, and does the average user leave it on LTE mode? Your Honor, it's not in the record. What is in the record was the question put to their expert about two things, whether you can disable LTE mode and whether people do, and there are good reasons to. Right, I know that. Your precise question I don't think is there. And then there are two more steps before you get to the Mode 3 request. You have to make a data request, a cellular data request, that is substantial enough that you would implicate Mode 1 and Mode 3. And then, without going to confidential information, you will see in footnote 22 of our brief the thresholds that have to be met, and then a Mode 3 request can be sent. But the thresholds involve the communication of Mode 1 information. They involve the number of handsets. So it seems to me that your argument, you've departed from whether the person owns, possesses, or operates. You're arguing a control. No, Your Honor. We're arguing that if you look at the steps of Claim 1, every single step of Claim 1 begins with the subscriber unit. Every single one. There are five steps. Every single one identifies what the device is. To go to Your Honor's characterization, it's the subscriber unit. That's the device. That's the device. And the person who owns and operates and uses the device is the subscriber. If the subscriber doesn't take the five steps that I've just identified, and you can break them down, you can count them more or less, you will never get to a Mode 3 request. So if I'm a blogger and I employ an infringing program, and I upload it to a server, let's say Amazon or some server, they don't know it and I'm blogging away, but it's residing on a server that's owned by Amazon. Under your theory then, Amazon, because they own the server, would be liable for the infringement. No, I actually think our theory would give you the opposite conclusion. Your Honor's hypothetical is very close to Symantec, which this Court decided is one of the three cases that I think answers Your Honor's first question. In Symantec, you're sitting at your computer. You have a virus detection device. But the virus detection device requires that you go outside your computer to a server, download a document, download it to your computer, and then the virus works. And what this Court said is the direct infringer is the user, not the server. The carrier here, which creates this step in the middle, if it's performed at all, is actually the equivalent of the server, both in your example and Symantec. So Symantec actually is very close to this case. It's what distinguishes it from CERF. The one step they claim, and I think there's one important thing here that I heard from Mr. Russell today, is while Claim 8 was argued separately to you in the Braves' divided infringement claim, they said today there's no divided infringement argument. This is just a direct infringement argument. And so if you look at the steps of Claim 1, the only place that the carrier is mentioned is in the third step, and it's providing information that will be used by the handset. That's exactly what happened in Symantec. Symantec is, Your Honor, the closest of the three cases to your hypothetical, but I think it answers actually most of the questions that were posed by the panel, which would include these. Who is the whoever? And it's the user in Symantec. Mr. Lee? Yes, sir. If LTE is never enabled, is the device never infringing? If LTE is not enabled, on these facts, it's not infringing. But there's no argument about whether it's not infringing. Actually, Your Honor, the fact that the device could be in LTE mode or not was a fact that's in the record below, and it was an important fact because that actually tells you a little bit about who is in control and who isn't because this is one of those circumstances where the fact that you can be operating out not using the method. So if you turn your device on and you're only using Wi-Fi, you're never going to use LTE. Is that in the appellate record, and where would that be if it is? This last point? Yes. That people don't use it all the time? I don't have the exact site, but in the brief you will find there is a reference to the discussion with their expert on the question of whether LTE is enabled all the time, and he says, in fact, personally, he doesn't use it all the time, and he disables it frequently. So that is in the record. I think the broader question that Judge Wallach asked, but I don't think it's in the record, but this one, which is do people use LTE all the time, the answer is no, and there are good reasons for it. I'd like to ask you about Claim 8. I agree with you that my question probably doesn't matter given that there is no divided infringement issue here, but do you think it's even possible that somebody could infringe a dependent claim but not the independent claim? Your Honor, I think the way these two claims are written, it's an odd argument that you could not infringe Claim 1 and not infringe Claim 8. I think the argument that's not being pursued now that would answer your question is this. At the very best reading, Adaptive's reply, it would be a divided infringement argument, but as you know, they disclaim divided infringement below. They also never argued Claim 8 separately below, and they in fact said specifically below that on all the claims, all the steps are performed at the Henslet Unit. And so in this particular case, it would be impossible, I think, practically. Thank you. Your adversary has said that he thinks that Erickson and Rico would be decided differently if there were a situation like this where the last immediate step for the method was some sort of initiation by the accused infringer. What's your response to that? Your Honor, I don't think that's correct. Actually, Erickson is an interesting comparator for this reason. The Erickson case involves the Wi-Fi standard. This involves the LTE standard. The standards are actually, as the Court knows, sort of an agglomeration of the result of the meetings of many different minds in many different disciplines. And the implementation standard involves the baseband manufacturer, the base tower manufacturer, the carriers, the handset sellers, the users, all of them. I think the answer to your question precisely is when you look at the divided infringement cases, they compare or contrast the concept of multi-parties acting independently. This is multi-parties acting independently. Qualcomm, Alcatel-Lucent, Erickson, the carriers, the handset sellers, HTC and Apple, the handset users, they're all complying with the standard, right? But no one of them is controlling the other. So I think we have to look at the specific elements of this claim. One, if I were to use it, an interesting thing is their light switch turning on, the request for mode 3, that's not part of the claim, right? The claim, as we've argued, starts with the subscriber unit. But what they've done is they've gone back just one step in the process and said, well, here's the request. That's enough to control. But if you go back further in the process, as I tried to do, Judge Rainey, in response to your question, it's quite clear that most of the decisions, if there are decisions that are going to determine whether you ultimately have a mode 3 request, are actually in the hands of the handset user. Mr. Lee, you keep couching your arguments in terms of control. And if control is the issue, then don't we have a material issue of fact and dispute here? Who has control of the remote device? Your Honor, I think I've been using control because that's the way they've articulated their argument. We think it's- No, your examples and your hypos have also centered on control. No, actually, Your Honor, then I've been unclear. Okay. Let me say it this way. If I focus on the elements of the claim, they all require the handset user, the subscriber unit, to do something. That is something the handset unit is being used by the subscriber. It's use and operation, which I think I said in answer to one of the questions. Let's go back even a little step further, okay? The phone itself is not the infringer or a potential infringer, correct? The device. Absolutely. That's exactly- I mean, the statute says it has to be whoever. Right. It's whoever. So now we've got two entities involved in the whoever. Isn't the central path to get to the answer here is control? Your Honor, I think not. I mean, that's the way they've tried to articulate it, and I think I can give you these three answers. The central inquiry is who is using the device to perform the method, and the user of the device- Suppose that I buy the phone and forget about it, go get another one, and then this one is left there. I'm not using that. I'm not possessing that. But suppose that performance of the method is still going on. May I answer the question? Yes, please. The answer would be you would have to buy the phone, you would have to enable cellular, you would have to enable LTE. Somehow the phone- See, isn't that control? No, Your Honor, that's- The buying, I understand. You bought it, and now you possessed it. You got it in the box. But to make it all happen, you've got to turn it on. You've got to ask for this type of service. So there's some element of use that seems to me, and this is what I'm exploring with you, that seems to me to be centered on control. Your Honor, it is use and- We've been talking about control because this is how they've couched the decision. Let me give two answers since I'm past my time. I'll give you the time, Pastor, and whatever my colleagues, any questions they may have as well. Your Honor, it is whoever uses because it's the use of the method that infringes. Control has been injected into the case because if you consider Judge Graywall's, the district court's footnote where he addresses the control argument, the argument was that he rejected the argument correctly, we think, that merely selling the device that performs a method is enough control under their concept to infringe. And in fact, of the three cases he cited, two of them were affirmed by this court after he decided the case. So he was focused on use and responding to their control. And what we're saying is just two things. One is use is the right concept, and if you think about Rico and Erickson and Symantec, it is all about use. And to the extent you address control, the judge did address control. He addressed it very specific and said, no, merely setting the request isn't control, and all I'm doing is responding by saying if you were going to go back up the series of steps in an effort to determine who's actually using by our characterization, if you go back to where this starts, it is the handset subscriber unit user that's using. If we find that, assuming that we find that control is the factor here, would you say that we would have to send this back to the court, that there's a material fact and dispute? No, Your Honor, for this reason. If you look at A40 in the magistrate judge's opinion, the magistrate judge specifically found that there was no evidence in the record of control. And, Your Honor, it was not a coincidence because there was an interrogatory. Let me see if I can give you the precise citation. There was an interrogatory that was asked during the district court proceedings of Adaptex that said, tell us how the carriers direct or control the handset users to perform any step of the method. That's at A6694-95, and it's a typical interrogatory answer. There are a lot of objections. But what you'll find, by omission, there is nothing there about the carriers controlling the handset users. So you have a specific question. But what about controlling the handset itself? And I think that's their argument. They're not arguing that they're controlling the user so much as that it's controlling the handset. Fair enough. I think that's correct, Your Honor. But if you look at the interrogatory answer, so the progression is, tell us, since you're focused on control, tell us what the evidence is of control. There's information there about controlling other things, but not the handset devices or users in our argument. And in fact, at 6606, you'll see this was specifically part of the argument made to the district court. So the district court then makes the finding that's at A40, no direction or control. Did you say A40? A40. It's the very last page of the judge's opinion. Thank you. So, Judge Rainey, to go to your question, is if the court were to move to a control concept, which would be taking Akamai one step further, we suggest, you have a record where the district court actually had before the interrogatory, had before the argument, and made a finding that there was no evidence that would even meet that, even under that legal test. Judge, do you have any questions? I do, I do. You had mentioned that there was about five steps the user would have to take before the method could be performed. Where is that in the record? Your Honor, I can tell you, if you actually look at the text that accompanies our footnote 22, I apologize for doing it this way. Footnote 22 has some confidential information about the fifth step. So it is in the portion of the brief. I think it's in our brief, A3738. But it's the text that accompanies footnote 22. OK. And footnote 22 has the confidential information about the fifth step. OK. Thank you. And then I just wanted to ask you about centillion. So if this court were to take a different approach with respect to user, kind of adopt centillion for use in that, how would that impact the outcome of this case in your view? Right. I'd say two things, Your Honor. Centillion is a system claim, not a method claim. So the person who initiates use of the system is a direct infringer under this court's law. So it's not the method claims are treated differently. I think the answer is if you extend centillion, as Adaptex has requested you to do, you're going to collapse in direct infringement, and direct infringement in an awful lot of circumstances. And I think given what this court has  what this court has said about the requirements under 271B, and I think this is important, really what they're coming to you and saying is it's a direct infringement case. Let's either extend centillion or let's extend Akamai to capture direct infringement, which today is captured by, there are doctrines that capture all of this. If I'm the user, to be more precise, I'm the direct infringer. If I induce the user, I'm an indirect infringer. If I supply a 271 tributary infringing product, I'm an indirect infringer. And then Akamai fills in for method claim the missing, if you call it the missing bucket, which is two people performing the steps under what circumstances is one a direct infringer. Those four doctrines, direct infringement, divided infringement, inducement, contributory infringement, actually cover all of the circumstances we've addressed. And it's the reason that I think that Rico and Symantec and Erickson came out the way they did. All right. Thank you very much. Thank you. Mr. Russell, I allow Mr. Lee those seven minutes over his time. I can extend those seven minutes to you as well to the extent that you need them. Thank you. I will try to be brief. I would like to start with the statutory language, move to the precedent, talk about the facts, and maybe get to this question about the interrogatories if I could. We agree that the central question here is who uses the method when the method is performed by a device. They seem to think that it's obvious that it is the person who is holding, owning, generally controlling the device. They've now abandoned the owning and possessing part. And we're in agreement. It's about control. Their position is controlling the device in general is sufficient. Our position is you have to control the aspect of the device which is running the method. And that, although it sounds like a small difference, is a critically important one. Because in our increasingly interconnected world, we all have devices that we do not exercise complete control over. And it's perfectly understandable that a cell phone company will want to control those aspects of a cell phone that are necessary to make it work on their network. But with that control comes responsibility to make sure that the operations that they are controlling on the phone do not infringe the patent. Now, with respect to precedent, our contention is my answer to you when you ask is there on-point precedent is there is precedent in which the court has assumed that the end user is responsible for the device's performance of a method patent. But those results are consistent with either their interpretation that we just attributed to the device's owner or to ours. Because in all of those cases, the end user was doing the act that immediately triggers the performance of the method. For example, in some Mantech downloading files from the internet, which is what triggered the performance of the virus scanning method on their computer. So I think you're going to have to figure this out, I think, on your own. And I can't simply point to some prior decision. I'd like to ask you a hypothetical. So what if there is a defibrillator, an implantable defibrillator for someone's heart, and it's programmed by the company. There's a company that makes it. Then the doctor programs it specifically for this individual. They put it in the person's, they implant it, and then the person has a particular episode. Their heart acts in a certain way. And between the doctor's programming and the way that it was set up by the manufacturer, it goes ahead and shocks the heart. Under your theory of control, who controlled that, and who's the infringer? Well, I think that's the right question to ask, is who controls the actual performance of the method. Maybe it's who has it. Maybe possession and use is a better way to look at it in the way that's been considered by this court. But anyway, I'm sorry. Well, I agree it's a simpler rule. It's a much simpler rule, but it's a rule that you simply cannot square with the text of the statute, which focuses on who is using the patented invention. And you can very easily use a patented invention that is practiced on a device that is in somebody else's hand or in somebody else's body. So, for example, if your hypothetical involved the doctor being able to remotely instruct the defibrillator to shock the heart because they think he's having a heart attack, I would think the answer is clear. It's the doctor pushing the button, telling the defibrillator to practice the method. How is that different from then from the doctor programming the device in advance to go off when the heartbeat is acting in a particular way? It may not be. Then you run into Rico, don't you, though? You run into Rico at that point. I think there may be some difficult questions of who is controlling a device in some circumstances. But I think that's why we think that referring to doctrines of approximate cause is a helpful thing to do here. Because all that the defendants have pointed to in their example of all the things a user must do is that the user is a but-for cause of the infringement, in the same way that the manufacturers are. But they're not saying that the manufacturers, because they are a but-for cause, are the people who are practicing the method. All the but-for causes lead up to is the device being on the LTE network. But that doesn't preordain that there will be infringement. Because, as I said before, the defendants have emphasized that you can use a phone in LTE mode on their network without infringing on the patent, so long as they have not elected to use mode 3 on their base stations. That decision is the intervening cause, and to speak in approximate cause terms, of the infringement. And it's their specific instruction to the device to practice the method that is the final and most direct, and in our view, the most appropriately viewed cause of controlling the performance of the method patent. And that makes perfect sense here, because these defendants are far better situated than anyone else to know and to figure out whether the operation of this device in this setting, in this respect, is violating somebody's patent, and to take steps to avoid it. They can just operate their base stations in another mode in order to avoid the infringement. And we think that that is what Congress would have intended. Do you agree that if we adopt a position that we're going to create peril with divided infringement and other aspects of law when we have multiple actors involved? I'm sorry, I didn't hear the first part. Well, your position, do you agree with your opponent that if we adopt a position that we're going to create, let's say, havoc within the indirect infringement law? No, I don't think it creates any more havoc than this court's decision saying direction and control of a person is as direct infringement. And that's because that doctrine has not allowed an evasion of indirect infringement liability, and neither will ours. Somebody who is simply inducing infringement, somebody who simply encourages or sells the phone, cannot be said to control the infringement. They are for cause, but they are not controlling the infringement because the phone can be used in a non-infringing manner. Somebody who simply provides a component like the chip the manufacturer here will not be able to be sued. What if the phone is programmed that once a day it's going to go ahead and perform the method? I think that's a more difficult case, but that's not this case because here the phone will not perform the method unless and until it receives this instruction from the carrier. You may have other cases in which you would have that scenario of the pre-programmed device. I think you can easily point to RICO in other cases and say, look, we've already held that that's not direct infringement here. This case, I think, is involving an important but narrow set of circumstances in which a device is being controlled by another person remotely, and it is a question of control. It's not a fact. Here, let me make my last point about the record. When the district court said that there was no factual evidence of control, that was based on his misconception, legal misconception, of what control means in this context. There was ample evidence in the record of all the things we've been talking about, of the fact that the method is performed only upon receipt of the command from the base station. That's in our expert's declaration, which was attached to our opposition to the motion for summary judgment. We think at the very least this is an issue, this is a case that should go forward. Any questions? Thank you very much. We thank the parties for the argument.